UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA BUCKOSH, | ) | CASE NO.  1:21-cv-0975 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET M. BRENNAN |
| v. | ) | |
| | ) | |
| BONDED FILTER COMPANY, | ) | **MEMORANDUM OPINION** |
| LLC, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

Before this Court is the Motion for Summary Judgment of Defendants Bonded Filter

Company, LLC ("Bonded"), Matthew Ashwood, and Stephen MacWilliams (collectively the

"Defendants").  (Doc. No. 46.)  Plaintiff Debra Buckosh opposed this motion (Doc. No. 55), and

Defendants replied in support (Doc. No. 61).  For the reasons that follow, this motion is

GRANTED in part and DENIED in part.

## I.  **BACKGROUND**

### A.  **Factual Background**

#### 1.  **Undisputed Facts**

Headquartered in Nashville, Tennessee, Bonded is a preventative maintenance service

provider for commercial heating, ventilation, and air conditioning ("HVAC") systems.  (Buckosh

Dep., Doc. No. 46-4 at PageID 835-36; Ashwood Dec., Doc. No. 46-2 at PageID 802.)  Matthew

Ashwood purchased Bonded in 2003 and became the chief executive officer.  (Ashwood Dec.,

Doc. No. 46-2 at PageID 802.)  Bonded makes a patented air filter product called PleatLink that

Bonded technicians use to service air filtration systems.  (*Id.*)  The product is purchased by

customers and installed by a Bonded technician.  (*Id.*)  Bonded also employs personnel who sell service contracts, market filters to new customers, and manage relationships with existing customers.  (*Id.*)

In 2018, Bonded acquired PureAir, another preventative service provider for commercial HVAC systems.  (*Id.* at PageID 803.)  After the acquisition, Bonded restructured and expanded its executive leadership team.  (*Id.*)  Bonded hired Curtis Czemeres as president and Steve MacWilliams as the chief revenue officer.  (*Id.*)  In April 2019, after this new leadership was in place, Ashwood changed his title from chief operating officer to executive chairman.  (*Id.*)

Czemeres created the position of business development manager and recruited Plaintiff Debra Dixon Buckosh for that position.  (Ashwood Dec., Doc. No. 46-2 at PageID 802; Czemeres Dep., Doc. No. 46-5 at PageID 995-97.)  Czemeres and Plaintiff had previously worked together.  (Czemeres Dep., Doc. No 46-5 at PageID 995.)  Plaintiff's employment offer letter, along with Bonded's employee handbook (to which Plaintiff consented), indicates that Plaintiff was an at-will employee.  (Buckosh Dep., Doc. No. 46-4 at PageID 939; Buckosh Offer Letter, Doc No. 56-6 at PageID 1434.)  The offer letter also contains a severance provision, which states:

> In the event of separation, you will be eligible for a severance package.  The company will provide three (3) month's severance, subject to local, state, and federal withholdings, provided the basis of the separation is without cause.

(Buckosh Offer Letter, Doc No. 56-6 at PageID 1434.)

Plaintiff began working at Bonded in early 2019.  (*Id.* at PageID 1433.)  She reported directly to MacWilliams.  (*Id.*)

Bonded terminated Plaintiff on February 26, 2020.  (MacWilliams Dec., Doc. No. 46-3 at PageID 816; Ashwood Dec., Doc. No. 46-2 at PageID 803.)  She was offered a severance

package if she agreed to sign a release of claims. (Buckosh Dep., Doc. No. 46-4 at PageID 863, 991-92.) Plaintiff did not sign the release and did not receive any severance pay. (*Id.*)

Bonded terminated Czemeres on February 14, 2020. (Ashwood Dec., Doc. No. 46-2 at PageID 803.) Ashwood once again became Bonded's chief executive officer. (*Id.*) After that, Bonded terminated MacWilliams on March 20, 2020. (*Id.*) Further, Bonded also terminated two other male sales employees on March 24, 2020. (*Id.* at PageID 803-04.) Bonded retained two male sales employees and one female sales employee. (*Id.*)

The parties agree on very little else.

### 2. Plaintiff's Factual Allegations

Plaintiff immediately ran into problems when she started at Bonded.

Ashwood – who had objections to her hiring – routinely interfered with her ability to perform her job. (Doc. No. 55 at PageID 1087, 1090.) He undermined her in front of customers, failed to provide her with relevant information regarding accounts, and removed her from tasks assigned by her direct supervisors. (*Id.* at PageID 1090.) Ashwood also had an inappropriate sexual conversation in Plaintiff's presence. (*Id.*) He eventually hired an independent contractor who made Plaintiff feel surveilled. (*Id.* at PageID 1091.) Ashwood did not treat male employees this way. (*Id.*) MacWilliams and Czemeres knew about Ashwood's behavior but chose to do nothing about it. (*Id.* at PageID 1090.)

While not as actively hostile as Ashwood, MacWilliams was of little help to Plaintiff and refused to participate in weekly meetings he had scheduled with her. (*Id.* at PageID 1091.) MacWilliams did not treat male employees like this. (*Id.*)

Despite these challenges, Plaintiff succeeded in her role. (*Id.* at PageID 1096-97.) She closed sales with Sherwin Williams, Carrier Corporation, Advanced Auto Parts, Circle-K and

3

Save Mart – totaling around four million dollars.  (*Id.*)  Apart from these sales, she helped save an account with Jones, Lange, LaSalle, who Bonded was on the verge of losing as a customer.  (*Id.* at PageID 1097.)  Her sales numbers were much higher than the output of the non-terminated male employees.  (*Id.* at PageID 1099.)

Throughout her employment, Bonded had no set system for tracking sales.  It switched to a new sales tracking software shortly after she arrived, but employee training was still occurring as of the month of her termination.  (*Id.* at PageID 1095.)  Bonded also never established a general a policy for determining which employee(s) would get credit for sales.  (*Id.*)

Shortly before terminating Plaintiff, Bonded hired Todd Rickman.  (*Id.* at PageID 1094.)  Rickman started 16 days before Plaintiff's termination and was given the title of "Business Development-Sales."  (*Id.*)  This title was similar to hers.  (*Id.*)  Rickman was also assigned one of Plaintiff's accounts.  (*Id.*)

### 3.  Defendants' Factual Allegations

Defendants paint a different picture of Plaintiff's time at Bonded.  Bonded failed to meet its revenue target after merging with PureAir.  (Doc. No. 46-1 at PageID 787.)  This underperformance was partly due to Plaintiff.  (*Id.*)  Bonded hired Plaintiff to make major sales, and all she ended up closing was a sale to Advanced Auto Parts.  (*Id.*)  This account generated little revenue.  (*Id.*)  After terminating Plaintiff, Bonded eliminated her position.  (*Id.*)  Bonded leadership determined it was not worth the expense.  (*Id.*)

Plaintiff was not the only high-level employee terminated for underperformance.  (*Id.*)  Bonded terminated Czemeres.  (*Id.*)  Bonded also fired MacWilliams and other sales employees.  (*Id.* at PageID 788.)  Plaintiff was treated no differently than male employees.  (*Id.*)  She, like everyone else at Bonded, was merely evaluated on the merits.  (*Id.*)

4

As far as Ashwood's behavior is concerned, Defendants acknowledge that he could be demanding to work with but treated everyone the same.  (*Id.* PageID at 799.)

### B.  Procedural Background

On April 6, 2021, Plaintiff initiated this action against Bonded Filter Company, LLC, Matthew Ashwood, Michael Massaro, Steven MacWilliams, Lee Ann Shepard, Avalt, and Mark Verdi in the Cuyahoga County Court of Common Pleas.  (Doc. No. 1-1.)  The complaint contains three counts: a gender discrimination claim under Ohio's employment discrimination laws (Count I), a retaliation claim under Ohio's employment discrimination laws (Count II), and a breach of contract claim (Count III).  (*Id.*)  On May 5, 2021, the defendants removed the case to federal court because complete diversity existed between the parties, and the amount in controversy exceeded $75,000.  (Doc. No. 1.)  On June 17, 202, Matthew Ashwood, Michael Massaro, Steven MacWilliams, and Lee Ann Shephard filed a motion to dismiss this case, as they contended the Court lacked personal jurisdiction over them.  (Doc. No. 5.)  The Court granted the motion in part and dismissed Massaro and Shephard, but it determined it had personal jurisdiction over Ashwood and MacWilliams.  (Doc. No. 12.)  After the close of discovery, Defendants submitted the instant motion for summary judgement.

## II.  ANALYSIS

### A.  Standard of Review

A motion for summary judgment must be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to a jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 630 (6th Cir. 2014) (citing *Anderson*, 447 U.S. at 255.)

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). Put another way, the party opposing the motion for summary judgment must present evidence supporting his claims. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."). Thus, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871 (1990); *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) ("A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-

movant.").  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

### B.  Gender Discrimination Claim

#### 1.  *McDonell Douglas* Framework

Plaintiff brings a claim of gender discrimination under Chapter 4112 of the Ohio Revised Code.  Because the requirements under this statute mirror those of federal law, courts "generally apply federal precedent to employment discrimination claims under Ohio law."  *Sarvak v. Urban Retail Props., LLC*, 524 F. App'x 229, 233 (6th Cir. 2013).

To demonstrate actionable discrimination, a plaintiff may put forward direct evidence or rely instead on inferential or circumstantial evidence.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012).  Here, according to her opposition brief, Plaintiff proceeds only under the latter approach.  (Doc. No. 55 at PageID 1092.)  When a claim builds on circumstantial evidence, courts use the three-step *McDonnell Douglas* burden-shifting framework to determine the propriety of summary judgment.  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981) (clarifying the employee's and the employer's burdens under its holding in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under *McDonnell Douglas*, the plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination.  *Burdine,* 450 U.S. at 253.  If done, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  Should the defendant carry the burden, the plaintiff must then prove that the stated justification is pretext for discrimination.  *Id.*  Throughout this entire

process, the burden of persuasion remains on the plaintiff to demonstrate that the defendant intentionally discriminated against her.  *Id.*

## 2. *Prima Facie* Case of Discrimination

The burden of establishing a *prima facie* case of discrimination "is not onerous."  *Id.*  The plaintiff must only demonstrate that she (1) was a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by someone outside of the protected class or was treated differently than a similarly situated, non-protected comparator employee.  *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021).  To grant summary judgment at this stage in *McDonell Douglas*, the Court must find that there is no genuine factual dispute as to the plaintiff's ability to establish one of these elements.  *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587 (6th Cir. 2002).

As a woman, plaintiff is a member of a protected class.  (Doc. No. 1-1 at PageID 9.)  She was terminated by Bonded.  (Ashwood Dec., Doc. No. 46-2 at PageID 803.)  Bonded recruited her because of her unique background and prior sales experience, which made her a good fit for the role.  (Czemeres Dep., Doc. No. 55-1 at PageID 1109-111.)  Plaintiff therefore has established the first three elements of the *prima facie* case.  Defendants do not dispute Plaintiff's ability to prove these elements.

Defendant's sole contention is that Plaintiff cannot establish the fourth consideration under *McDonnell Douglas*' *prima facie* case: that Bonded either replaced her with someone outside of her protected class or treated a similarly situated, non-protected comparator employee differently than her.  (Doc. No. 61 at PageID 1462-63.)  Accordingly, the Court must determine whether Plaintiff has presented sufficient facts from which to infer that Bonded replaced her with or treated her differently than a male employee.  *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921

F.3d 599, 606 (6th Cir. 2019).

Plaintiff argues she satisfies this element because she was replaced by a male, Todd Rickman.  (Doc. No. 55 at PageID 1094.)  She cites record evidence indicating that Bonded offered Rickman employment on January 6, 2020, which he accepted on January 10, 2020.  (Rickman Offer Letter, Doc. No. 56-1 at PageID 1414-415.)  Further, Plaintiff shows that Rickman started on February 10, 2020 – 16 days before Bonded terminated Plaintiff.  (Rickman Offer Letter, Doc. No. 56-1 at PageID 1414; Ashwood Dec., Doc. No. 46-2 at PageID 803.)  Rickman's job title was "Business Development-Sales," which, as Plaintiff notes, is like her previous job title of "Business Development Manager."  (Rickman Offer Letter, Doc. No. 56-1 at PageID 1414; Buckosh Offer Letter, Doc. No. 56-3 at PageID 1419.)  Finally, Plaintiff points to testimony indicating that Bonded assigned Rickman her job responsibilities.  (Buckosh Dep., Doc. No. 55-5 at PageID 1327.)

Defendants argue that this evidence is insufficient for two reasons.  (Doc. No. 61 at PageID 1462-464.)  First, Defendants contend that Plaintiff has provided no record evidence establishing that Rickman took over one of her accounts.  (*Id.* at PageID 1462.)  Second, Defendants assert that Plaintiff has not provided any evidence to prove that Bonded hired Rickman to replace her, rather than one of the other terminated sales employees.  (*Id.* PageID 1463.)

Defendants' first argument is incorrect.  Plaintiff testified that Rickman took over one of her accounts.  (Buckosh Dep., Doc. No. 55-5 at PageID 1324.)  Her deposition testimony must be credited for summary judgment purposes. *See e.g., Bradley v. Arwood*, 705 F. App'x 411, 419 (6th Cir. 2017) (holding that a reasonable jury could conclude that the employer's action was racially motivated because "for summary judgment [the court] must credit [the plaintiff

employee's] testimony" that such actions were racially motivated); *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("[S]elf-serving statements can create a genuine dispute of material to be resolved at trial.").  And Defendants provide no evidence to refute Plaintiff's testimony that Rickman was given one of her accounts.  When asked whether Rickman took over the account in question, MacWilliams responded that he could not recall "one way or the other."  (MacWilliams Dep., Doc. No. 55-2 at PageID 1191.)  This is not sufficient to settle this dispute.

Plaintiff need not show that Rickman took over specific accounts; rather, she must show that Rickman "was hired or reassigned to perform [Plaintiff's] duties."  *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 284 (6th Cir. 2012) (internal quotation marks omitted).  For example, in *Blizzard*, the court found that an employee proved the fourth *prima facie* element because there was record evidence indicating that the defendant hired a new employee to perform the plaintiff's old job responsibilities as an accounts payable clerk.  *See id.* at 281-84.  Here, Plaintiff pointed to record evidence indicating that Bonded hired Rickman to perform the same job duties as Plaintiff.  (Buckosh Dep., Doc. No. 55-5 at PageID 1327.)  In addition to her own testimony, she relies on MacWilliams' testimony that Rickman previously performed the same duties at his old job that Plaintiff performed at Bonded: account management and sales.  (MacWilliams Dep., Doc. No. 55-2 at PageID 1191; Buckosh Offer Letter, Doc. No. 56-3 at PageID 1419.)  Notable for summary judgement purposes is that Defendants do not contradict any of the testimony on this point.

Defendants' second argument focuses on the apparent lack of evidence that Bonded hired Rickman to specifically to replace Plaintiff, as opposed to replacing one of the other two sales employees who Bonded terminated around that same time as Plaintiff.  (Doc. No. 61 at PageID 1463.)  In support, Defendants highlight that Plaintiff, in her opposition brief, represents that all

employees – regardless of title – essentially performed the same general sales functions.  (*Id.*)

This admission, Defendants contend, makes Plaintiff unable to show that Rickman was her

specific replacement.  Although this may undercut Plaintiff's argument, a reasonable inference

can still be drawn that that Rickman replaced Plaintiff.  For example, a jury could reasonably

give weight to Bonded's decision to include "business development" in Rickman's title.

Ashwood's declaration indicates that the other two employees Bonded terminated were mere

"sales" employees, whereas Bonded explicitly hired Plaintiff and Rickman for "business

development." (Ashwood Dec., Doc. No. 46-2 at PageID 803-04.)

The Court finds a genuine dispute over whether Bonded hired Rickman to replace

Plaintiff, precluding summary judgment at the *prima facie* case stage.[1]  Plaintiff has pointed to

record evidence establishing that a male employee started working at Bonded right before her

termination.  And, according to various parts of the record, the new employee was given a

similar job title, performed the same job duties, and took over one of her accounts.  From this, a

reasonable jury could infer that Bonded replaced Plaintiff with a male. [2]

Plaintiff also asserts that she has established this element because she has identified three

similarly situated male employees who did not face an adverse employment action.  (Doc. No. 55

---

[1] The Sixth Circuit has also made clear that an employee can still prove this element when, like
Plaintiff here, the employer hired the replacement before terminating the plaintiff employee.  *See
Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) (holding that a jury could reasonably
find that an employee hired the day before the plaintiff's termination was the plaintiff's
replacement).

[2] Although not cited by Plaintiff, after reviewing the evidence cited in the parties' briefs, the
Court finds two additional facts also favor a finding that a genuine dispute exists on this issue.
First, the record indicates that Bonded did not terminate the other sales employees until over a
month after Rickman began working for Bonded.  (Ashwood Dep., Doc. No. 46-2 at PageID
803.)  Second, Plaintiff's and Rickman's offer letters both indicate that the employees made
similar salaries and reported to MacWilliams.  (Rickman Offer Letter, Doc. No. 56-1 at PageID
1414; Buckosh Offer Letter, Doc. No. 56-3 at PageID 1419.)

at PageID 1093.)  In response, Defendants assert that these employees are not proper comparators because their job performance far exceeded Plaintiff's.  (Doc. No. 61 at PageID 1464-465.)  Given that this Court has already determined that Plaintiff has put forward enough evidence to support a *prima facie* case of discrimination, the Court considers these arguments as they relate to pretext.

### 3. Legitimate, Non-Discriminatory Reason

Defendant's burden at the second stage is merely to provide some evidence that they had a non-discriminatory reason for their adverse employment action.  *Burdine*, 450 U.S. at 254-55.  Defendants – with supporting declarations – articulate that their non-discriminatory reason for terminating Plaintiff is their belief that she did not close enough sales for Bonded to justify maintaining her position.  (Ashwood Dec., Doc. No. 46-2 at PageID 803; MacWilliams Dec., Doc. No. 46-3 at PageID 816.)  Plaintiff does not dispute Defendants' ability to meet their burden of articulating a legitimate, non-discriminatory reason and, instead, challenges the veracity of this reason at the pretext stage.  The Court finds that Defendants have carried their burden at the second stage of *McDonnell Douglas*.  *See e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (holding that employer properly proffered a legitimate, non-discriminatory reason because HR manager submitted an affidavit explaining employer's reason for terminating plaintiff).

### 4. Pretext

To prove pretext, the plaintiff must introduce admissible evidence to show that the defendant's non-discriminatory reason is untrue, and, instead, discriminatory animus motivated the decision.  *Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 954 (6th Cir. 2007).  To carry this burden, the plaintiff can show that the defendant's non-discriminatory reason for the adverse

action either: has no basis in fact, did not actually motivate the employer's actions, or was insufficient to motivate the employer's actions. *Miles v. South Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Although Plaintiff bears the full burden of proof at this stage of *McDonell Douglas*, the Court must still review all evidence in the light most favorable to her as the non-movant. *Jackson v. VHS Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016). And, after making these favorable inferences, the Court's ultimate inquiry focuses on whether a jury could reasonably "doubt [Bonded's] explanation" for terminating Plaintiff. *See Redlin*, 921 F.3d at 612 (internal quotation marks omitted).

Plaintiff presents three arguments as to why Defendants' reason is mere pretext for discrimination: work interference, unreliable sales data, and uncredited sales. Not surprisingly, Defendants contest these arguments. Each is addressed in turn.

***Work interference.*** Plaintiff asserts that she was "denied sales opportunities and training given to male salespersons[,] and her sales efforts were obstructed." (Doc. No. 55 at PageID 1095.) In support, she directs the Court to her testimony describing Ashwood embarrassing her in front of colleagues and co-workers, refusing to introduce her to customers, derailing her work, and making a sexual comment in front of her. (Buckosh Dep., Doc. No. 55-5 at PageID 1294-298, 1320-321, 1326-327.) Plaintiff also notes that Bonded hired an independent contractor to assist her with sales, who she asserts ultimately undermined her ability to perform and made her feel needlessly surveilled. (Ashwood Dep., Doc. No. 54-4 at PageID 1266-267; Buckosh Dep., Doc. No. 55-5 at PageID 1298-299.) Bonded hired no similar independent contractor for any of its male sales employees. (Ashwood Dep., Doc. No. 54-4 at PageID 1267.)

While Plaintiff has not cited anything outside of her deposition testimony to support her claim that Bonded knowingly hindered her ability to perform due to her gender, Defendants have

provided no evidence directly rebutting any of Plaintiff's testimony.[3]  *Cf. Bowling Transp., Inc. v. NLRB.*, 352 F.3d 274, 285 (6th Cir. 2003) (holding that employee's self-serving testimony was, standing alone, enough to allow an employee to prevail in an administrative proceeding when the employer only relied on their self-serving testimony to contradict the employee). Whether Bonded's leadership knowingly hindered Plaintiff's performance because of her gender is a material issue at the pretext stage.  *See Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003) (finding that manager's racist comments, lack of training, failure to introduce to upper management, public criticism, and unwarranted blame were sufficient evidence to show poor performance was pretext for discrimination).  That there is a genuine dispute on this issue precludes summary judgment.  *See id.*

*Unreliable sales data.*  Next, Plaintiff argues that the sales records Defendants used to assess her performance are unreliable.  Bonded transitioned to a new sales tracking program shortly after Plaintiff began work, and Bonded was still in the process of training employees on the program until days before Plaintiff's termination.  (Dorsey Dep., Doc. No. 55-3 at PageID 1232-233;[4] Ashwood Dep., Doc. No. 55-4 at PageID 1260-261; Doc. No. 55-8.)  Further, during Plaintiff's tenure, Bonded had no official policy regarding how sales should be tracked other than that sales should be evidenced in writing.  (Dorsey Dep., Doc. No. 55-3 at PageID 1228; MacWilliams Dep., Doc. No. 55-2 at PageID 1180-181, 1197, 1202; Buckosh Dep., Doc. No. 55-5 at PageID 1308-309.)

---

[3] Defendants' only rebuttal is testimony from Czemeres indicating that Ashwood was difficult to work for because he expected all employees – including males – to accept and follow his ideas of how business should be conducted.  (Czemeres Dep., Doc. No. 55-1 at PageID 1151.)  But this testimony does not directly refute Plaintiff's assertion that Ashwood singled her out – not by being merely demanding and challenging to work with – but instead, among other things, by intentionally undermining her ability to work and making a sexual comment.  (*Id.*)

[4] Richard Dorsey was a sales employee at Bonded.  (Doc. No. 46-1 at PageID 788.)

In response, Defendants point to deposition testimony that they say contradicts some of Plaintiff's arguments.  (Doc. No. 61 at PageID 1453.)  Some of these arguments are well-taken; for example, the record does not establish that it was common practice at Bonded to credit employees for oral agreements.  (Dorsey Dep., Doc. No. 55-3 at PageID 1228.)  But the Court is left with record evidence indicating Bonded was still training employees on the new software before Plaintiff's termination and had no clear policy on when it would credit an employee for a sale.  There remains a genuine factual dispute over the accuracy of the data that Bonded used to track sales, which is material to how Bonded evaluated Plaintiff's performance.

*Uncredited Sales.*  Last, Plaintiff argues that Bonded disregarded her actual sales record. (Doc. No. 55 at PageID 1096-100.)

 In their briefing and supporting declarations, Defendants contend that Plaintiff only closed one major deal: Advanced Auto Parts.  (Ashwood Dec., Doc. No. 46-2 at PageID 803; Doc. No. 46-1 at PageID 787.)  Plaintiff disputes this contention by citing record evidence showing that she closed other deals.  (Doc. No. 55 at PageID 1096.)  Thus, to prevail on summary judgment, Defendants must *either* show that Plaintiff's evidence is insufficient to infer that she closed other sales *or* provide evidence showing that Bonded credited her for these deals, but her performance still did not justify retention.  Defendants do not prevail under either option, which means Plaintiff has succeeded in establishing that a jury could reasonably infer that Bonded's reason for her termination has no basis in fact and/or did actually motivate Bonded.[5]

---

[5] The parties dispute the value of the additional deals that Plaintiff contends she closed. Defendants argue that this Court should outright disregard Plaintiff's valuations of these deals because they contradict Plaintiff's deposition testimony.  (Doc. No. 61 at PageID 1454.)  The Court finds that it does not need to address these arguments to determine that a genuine dispute exists at the pretext stage.  Plaintiff has provided sufficient evidence from which a jury could reasonably infer that she made more than one major sale, regardless of whether it considers her affidavit explaining how much these deals were worth.

*See e.g., Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526-27 (6th Cir. 2008) (finding there to be a genuine dispute at the pretext stage when the plaintiff produced evidence undermining the defendant's business judgment rationale, and the defendant failed to provide much evidence establishing its legitimate, non-discriminatory reason had a strong basis in fact); *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (noting that "summary judgment is not appropriate every time an employer offers this business judgment rationale" because there may be facts from which "a reasonable jury could conclude that the employer's business decision was so lacking in merit as to call into question its genuineness" (internal quotation marks omitted)).

Take the parties' evidence relating to the Carrier Corporation contract. Plaintiff cites Czemeres' and MacWilliams' testimony in which they both admit that Plaintiff closed a sale to Carrier Corporation. (Czemeres Dep., Doc. No. 55-1 at PageID 1127; MacWilliams Dep., Doc. No. 55-2 at PageID 1170.) Defendants, in turn, wrongly assert that Plaintiff provided no evidence that Carrier Corporation signed a contract. (Doc. No. 61 at PageID 1466.) Of note, Czemeres stated, "she did" when asked whether Plaintiff closed a "major contract" with Carrier Corporation. (Czemeres Dep., Doc. No. 55-1 at PageID 1127.) Further, this testimony indicates that this contract was not for mere future services. Czemeres testified that Bonded quickly commenced work with Carrier Corporation. (*Id.*) Without any record citation, Defendants hint in their reply brief that this contract did not generate any revenue. (Doc. No. 61 at PageID 1466.) But if this contract generated no revenue, why would Czemeres characterize Carrier Corporation as a major contract? (Czemeres Dep., Doc. No. 55-1 at PageID 1127.) This material question of fact cannot be answered from the evidence presented in the parties' briefs.[6]

---

[6] More generally, the Court finds that significant questions remain over what Bonded's policies were for evaluating its sales employees' performances. Defendants' summary judgment motion indicates that sales employees were credited after they brought in a customer, and that

Another example is the Sherwin Williams contract.  In support of her assertion that she deserves credit for this sale, Plaintiff cites testimony from Czemeres indicating that (a) Bonded was facing the possibility of having this account canceled, (b) Plaintiff helped Bonded keep the account, and (c) Plaintiff was the only sales representative responsible for such action. (Czemeres Dep., Doc. No. 55-1 at PageID 1115-118, 1125; Doc. No. 55-9; Doc. No. 55-10.) Aside from contesting Plaintiff's valuation of the contract, in response, Defendants merely dispute Plaintiff's characterization that she "salvaged" Bonded's relationship with Sherwin Williams.  (Doc. No. 61 at PageID 1466.)  This rebuttal casts no doubt on Plaintiff's assertion that she (a) worked on this contract and (b) deserved credit for said work.

Making their final argument, Defendants cite the "honest belief rule" and assert that Plaintiff provided no evidence that Bonded did not honestly believe that Plaintiff performed her job poorly.  (Doc. No. 61 at PageID 1467.)  The "honest belief rule . . . precludes a finding of pretext when an employer's nondiscriminatory reason for terminating an employee is later proven false, so long as the employer can show that it honestly believed the reason was true when making the termination decision."  *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 606 (6th Cir. 2022).  In *Boshaw*, the Sixth Circuit recently applied this doctrine and granted summary judgment despite the employee asserting that the proffered reason for his termination – that he was impermissibly absent from a meeting and a shift – was false since he received permission to

_____

customer's purchases generated revenue.  (Doc. No. 46-1 at PageID 785.)  Further, the employee who initially brought in the customer would receive credit (and commission) for all additional sales to the customer, regardless of whether they were the employee who helped the customer make the specific purchase.  (*Id.*)  But Plaintiff highlights record evidence casting serious doubt on if this was the actual policy – especially for large accounts with more than one active sales employee.  (MacWilliams Dep., Doc. No. 55-2 at PageID 1206-207; Dorsey Dep., Doc. No. 55-3 at PageID 1231; Buckosh Aff., Doc. No. 55-7 at PageID 1352.)  This dispute is material because it directly relates to how and why Defendants concluded that Plaintiff performed unsatisfactorily.

miss work on the day in question.  *Id.*  In making this decision, the court noted that the majority owner of the business submitted an affidavit articulating that he was unaware that the employee believed he had permission to miss work until after he terminated the employee.  *Id.*  The court therefore held the owner honestly believed his stated reason for terminating the plaintiff.  *Id.*

Unlike *Boshaw*, the Court finds that there is a genuine dispute as to whether Bonded's management honestly believed their stated reason for terminating Plaintiff.  To start, a jury can reasonably infer that Bonded is not large enough of a company where the decisionmakers would not have known Plaintiff's actual sales contribution.   Plaintiff has also provided MacWilliams' (her direct supervisor) testimony in which he admitted that Plaintiff closed a sale with a customer other than Advanced Auto Parts.  (*Compare* Doc. No. 46-3 at PageID 816 (MacWilliams' declaration stating that Plaintiff's only major deal was with Advanced Auto Parts) *with* Doc. No. 55-2 at PageID 1170 (MacWilliams' deposition testimony on Plaintiff's involvement with closing the Carrier Corporation deal).)

In the end, the evidence presented in the parties' briefs is not "so one-sided" that a jury could only find that Bonded terminated Plaintiff because management honestly believed her poor sales performance warranted termination.  *See Redlin*, 921 F.3d at 606, 612.  Because of this, Plaintiff has carried her burden at the pretext stage.

### 5.  Summary and Conclusion

After reviewing all evidence submitted in support of the parties' arguments and drawing all reasonable inferences in Plaintiff's favor, the Court finds that material questions of fact remain.  A jury could reasonably find that Plaintiff has carried her burden under *McDonell Douglas* of establishing the *prima facie* case of discrimination and then proving Defendants' legitimate, non-discriminatory reason for her termination is pretext.  Accordingly, the Court

DENIES Defendants' motion for summary judgment as it relates to Plaintiff's gender discrimination claim.

### C.  **Retaliation Claim**

Defendants also seek summary judgment on Plaintiff's retaliation claim under Ohio Revised Code § 4112.  To prevail on this claim, Plaintiff must establish a *prima facie* case of retaliation – meaning she must provide evidence that (1) she engaged in a protected activity,[7] (2) Bonded knew about the protected activity, (3) Bonded took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse action.  *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007).

As an initial matter, Defendants note in their reply brief that there is an inconsistency between the retaliation theory that Plaintiff alleges in her complaint and the one that she discusses in her opposition brief.  (Doc. No. 61 at PageID 1459-460.)  Plaintiff's complaint alleges that Defendants retaliated against her because she refused to sign a release of claims. (Doc. No. 1-1 at ¶¶ 23, 36, 36, 40 & 51.)  But, in her opposition brief, she claims she was retaliated against because she complained to Bonded management about illegal sex discrimination.  (Doc. No. 55 at PageID 1102.)

The Sixth Circuit prohibits plaintiffs from raising a theory of liability for the first time in a summary judgment opposition brief.  *E.g., Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (noting that permitting the plaintiff to raise a new claim in response to a summary judgment motion "would subject defendants to an unfair surprise");

---

[7] An employee engages in protected activity when they oppose "any practice made an unlawful employment practice," which covers not only the filing of the formal discrimination charges with the EEOC but also complaints to management and less formal protests of discriminatory employment practices.  *Ruiz-Fane v. Tharp*, 545 F. Supp. 3d 543, 557 (N.D. Ohio 2021) (citing *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015)).

*Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [the plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal."). Thus, this Court may only examine whether Defendants retaliated against Plaintiff because she refused to sign the release.

Plaintiff cannot establish a *prima facie* case of discrimination under the theory that she engaged in protected activity by refusing to sign the release. *See EEOC. v. SunDance Rehab. Corp.*, 466 F.3d 490, 501 (6th Cir. 2006). In *SunDance*, the Sixth Circuit evaluated a similar retaliation claim and called the plaintiff's argument – that she engaged in protected activity by refusing to sign a release of claims – a "dubious proposition." *Id.* Although the court granted the defendant summary judgment because the plaintiff was not entitled to severance under her employment agreement, and thus denial of severance was not adverse employment action, the Third Circuit, citing *SunDance*, held that such conduct is not protected activity. *SunDance*, 466 F.3d at 501-02; *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 452 (3d Cir. 2015). Specifically, the *Allstate* court determined that the plaintiff's case was "doom[ed] . . . at the outset" because refusing to sign a release of claims "does not communicate opposition sufficiently specific to qualify as protected activity." 778 F.3d at 452. The Court agrees that failure to sign a release, without more, is not protected activity.

Plaintiff has not pointed to any record evidence or authority that convinces this Court that her refusal to sign the severance agreement was protected activity. The Court therefore follows the guidance provided by *SunDance* and *Allstate* and GRANTS summary judgment on this claim.

### D. Breach of Contract Claim

Defendants also move for summary judgment on Plaintiff's third and final claim that

Bonded breached the offer of employment letter.  Plaintiff does not allege breach based on a wrongful termination theory.  Rather, she asserts that Bonded breached their contractual duty to pay her severance under the letter's severance provision:

> In the event of separation, you will be eligible for a severance package.  The company will provide three (3) month's severance, subject to local, state, and federal withholdings, provided the basis of the separation is without cause.

(Buckosh Offer Letter, Doc No. 56-6 at PageID 1434.)

Defendants advance two arguments in their summary judgment motion.  First, they argue that the offer letter is not a valid contract, and then that the severance provision does not reflect the requisite "meeting of the minds."  Both arguments fail.

***Enforceability.***  Defendants argue the offer letter was not a valid contract – and all its terms are rendered unenforceable – because it did not specify a term of employment.  (Doc. No. 46-1 at PageID 789-90 (citing *Leeper v. HealthScope Benefits,* No. 2:19-CV-5401, 2020 WL 1290089, at *6-8 (S.D. Ohio Mar. 18, 2020) & *Godfrey v. Mastec, Inc.*, No. 1:15-CV-409, 2015 WL 7570209, at *4-5 (S.D. Ohio Nov. 25, 2015)).)  In response, Plaintiff asserts that a lack of a specified term of employment does not render all terms in the offer letter unenforceable.  (Doc. No. 55 at PageID 1103 (citing *State ex rel. Ard v. Sandusky*, 2015-Ohio-5158, 2015 WL 8538454, at *4 (Ohio Ct. App. Dec. 11, 2015) & *Iberis v. Mahoning Valley Sanitary Dist.*, 2001-Ohio-8809, 2001 WL 1647184, at *4 (Ohio Ct. App. Dec. 21, 2001)).)

Employment offer letters can be binding employment contracts.  *See Brown v. Fukuvi USA Inc.*, 2022-Ohio-1608, 2022 WL 1514910, at *8 (Ohio Ct. App. May 13, 2022); *You v. Ne. Ohio Med. Univ.*, 2020-Ohio-4661, 2020 WL 5797889, at *4 (Ohio Ct. App. Sept. 20, 2020).  But, like all employment agreements, the offer letter must contain explicit durational language to overcome Ohio's presumption of at-will employment.  *See Henkel v. Educ. Rsch. Council of*

21

*Am.*, 344 N.E.2d 118, 121-22 (Ohio 1976). That said, even at-will employment agreements without durational terms can contain enforceable provisions – including severance provisions. *Sandusky*, 2015 WL 8538454, at *3 (holding that the severance provision found in an at-will employee's contract was enforceable because "severance benefits [did] not alter [the employee's] at-will status"); *Iberis*, 2001 WL 1647184, at *4;[8] *see also Salerno v. Steel Plate, LLC*, No. 5:20-CV-1598, 2021 WL 1061939, at *4 (N.D. Ohio Mar. 19, 2021) (denying motion to dismiss a claim for breach of employment contract's severance provision, regardless of the contract indicating that the employee could be terminated at-will).

The authority Defendants cite is not persuasive. Two of the cases that Defendants rely on merely state that offer letters, like employment contracts, require durational language to establish an employment relationship that is anything other than at-will. *Godfrey*, 2015 WL 7570209, at *4-5; *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 153 (Ohio 1985). The one case that Defendants cite that supports its interpretation of Ohio law is not binding. (Doc. No. 61 at PageID 1457 (citing *Leeper*, 2020 WL 1290089, at *7).) Further, another Judge in this District has rejected such an interpretation of Ohio law. *Vaughn v. Charter Commc'ns, LLC*, No. 1:19-CV-2258, 2020 WL 377830, at *2 (N.D. Ohio Jan. 23, 2020) (rejecting the defendant's argument that "a letter must specify a term for the duration of employment to form an employment contract").

To summarize, Plaintiff's at-will employment is not in dispute. Instead, the parties dispute whether Bonded owes Plaintiff severance under the offer letter's severance provision.

---

[8] Defendants argue that this case is inapplicable because the employment agreement at issue included a durational term. (Doc. No. 61 at PageID 1457.) In making this distinction, Defendants ignore that the court held that any language in the contract that altered the employee's at-will status was deemed void and without effect. *Iberis*, 2001 WL 1647184, at *4. The court nevertheless enforced the contract's severance provision. *Id.*

Because this Court has already determined that such promises are enforceable in an at-will employment agreement, like the one here, Defendants' first argument fails.  Bonded was obligated to comply with the offer's severance provision absent some other reason why the severance provision is unenforceable.

**Meeting of the minds**.  Defendants alternatively argue that even if the offer letter is not *per se* unenforceable, they still prevail because the severance provision does not indicate *when* Plaintiff would be eligible for severance pay.  (Doc. No. 46-1 at PageID 790; Doc. No. 61 at PageID 1458-459.)  Defendants therefore posit that there was no meeting of the minds, and the severance provision is unenforceable.  This argument is not well-taken.

A jury could reasonably find that there was a meeting of the minds between the parties on when Plaintiff would be eligible for severance pay.  (Buckosh Offer Letter, Doc. No. 56-6 at PageID 1434.)  The provision's first sentence states that Plaintiff is "eligible for a severance package" in "the event of separation."  (*Id.*)  The provision's second sentence defines her eligibility by stating that Bonded will pay her severance if it terminates her without cause.  (*Id.*)  Just because Defendants have ideas about how the offer letter (which they drafted) could have been written more clearly – for example, by using the word "entitled" instead of "eligible" – does not mean that the contract is so ambiguous as to render it unenforceable.  *See e.g., Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) ("[I]t is equally well settled that a court cannot create ambiguity in a contract where there is none.").

Given that only Defendants have moved for summary judgment on this issue, this Court need not interpret this provision any further.  The Court concludes that Defendants have not carried their burden of showing that, as a matter of law, there was no meeting of the minds on when Defendants owed Plaintiff severance pay.

23

Accordingly, the Court DENIES Defendants' summary judgment motion as to Plaintiff's breach of contract claim.

## III. <u>CONCLUSION</u>

For the reason stated above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  (Doc. No. 46.)

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
Date: August 25, 2022          UNITED STATES DISTRICT JUDGE